# In the United States Court of Federal Claims

No. 15-767C
(consolidated with 16-309C)

(E-Filed: April 6, 2020)[1]

|  |  |  |
|---|---|---|
| ACLR, LLC, | ) | |
| | ) | Summary Judgment; RCFC 56; |
| Plaintiff, | ) | Termination for Convenience; |
| | ) | Constructive Termination for |
| v. | ) | Convenience; Breach of Contract. |
| | ) | |
| THE UNITED STATES, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

Thomas K. David, Reston, VA, for plaintiff.  John A. Bonello, of counsel.

Adam E. Lyons,[2] Trial Attorney, with whom were Joseph H. Hunt, Assistant Attorney General, Robert E. Kirschman, Jr., Director, Martin F. Hockey, Jr., Deputy Director, Commercial Litigation Branch, Civil Division, United States Department of Justice, Washington, DC, for defendant.  Lucy Mac Gabhann, Office of General Counsel, United States Department of Health and Human Services, Baltimore, MD, of counsel.

## OPINION AND ORDER

CAMPBELL-SMITH, Judge.

Currently before the court are plaintiff's motion for partial summary judgment, ECF No. 51, and defendant's cross-motion for summary judgment, ECF No. 52, which

---

[1] This opinion was issued under seal on March 23, 2020.  Pursuant to ¶ 3 of the ordering language, the parties were invited to identify proprietary or confidential material subject to deletion on the basis that the material was protected/privileged.  No redactions were proposed by the parties.  Thus, the sealed and public versions of this opinion are identical, except for the publication date and this footnote.

[2] Mark E. Porada was the Trial Attorney on defendant's response and cross-motion for summary judgment.

have been extensively briefed.  The parties' motions are brought pursuant to Rule 56 of the Rules of the United States Court of Federal Claims (RCFC).  In ruling on the motions, the court has also considered:  (1) plaintiff's motion for partial summary judgment memorandum, ECF No. 51-1; (2) plaintiff's proposed findings of uncontroverted fact, ECF No. 51-11; (3) plaintiff's exhibits, ECF No. 51-2 through 51-10; (4) defendant's response to plaintiff's motion and cross-motion for summary judgment, ECF No. 52; (5) defendant's proposed findings of uncontroverted fact and response to plaintiff's proposed findings of uncontroverted fact, ECF No. 53; (6) defendant's appendices, ECF No. 52-1 and 52-2; (7) plaintiff's response/reply brief, ECF No. 58; (8) plaintiff's response to defendant's proposed findings of uncontroverted fact, ECF No. 58-6; (9) plaintiff's supplemental exhibits, ECF No. 58-1 through 58-5; (10) defendant's reply brief, ECF No. 61; (11) plaintiff's sur-reply brief, ECF No. 65; (12) plaintiff's supplemental brief, ECF No. 69; (13) defendant's response to plaintiff's supplemental brief, ECF No. 70; (14) plaintiff's addendum to its supplemental brief, ECF No. 71; (15) plaintiff's supplemental reply brief, ECF No. 73; (16) defendant's supplemental sur-reply, ECF No. 74.[3]  The parties did not request oral argument, and the court deems such argument unnecessary.

For the following reasons, plaintiff's motion for partial summary judgment is **DENIED**, and defendant's cross-motion for summary judgment is **GRANTED**.

I.   Background

   A.   Procedural History

Jurisdiction in these consolidated cases is governed by the Contract Disputes Act of 1978, 41 U.S.C. §§ 7101-7109 (2012) (CDA).  As required by the CDA, plaintiff filed two certified claims with the contracting officer.  The first—which was submitted on March 12, 2015, in the amount of $28,506,591—included damages related to the 2007 audit and the 2010 audit.  See ECF No. 52-1 at 132-36.  That certified claim was denied on June 5, 2015.  See id. at 138-45.  Plaintiff filed suit in this court on July 22, 2015, contesting the denial of its certified claim for $28,506,591.  See ACLR, LLC v. United States, Case No. 15-767C, ECF No. 1 (complaint).

The second certified claim—which was submitted on September 10, 2015, in the amount of $79,314,795—included damages related to the 2012/2013 sales tax audit.  See ECF No. 52-1 at 164-67.  This certified claim was denied on January 15, 2016.  See ECF No. 51-9 at 30-34.  Plaintiff filed suit in this court on March 9, 2016, contesting the denial of its certified claim for $79,314,795.  See ACLR, LLC v. United States, Case No.

---

[3]   The court recognizes the extensive briefing in this case.  Subsequent briefing to the parties' initial cross-motions revealed and narrowed the dispositive issues in this case.  The court addresses herein only those dispositive issues.

16-309C, ECF No. 1 at 6 (complaint). Plaintiff increased its claimed damages in the suit before this court to $112,002,489. See id. at 8.

Following discovery these two cases were consolidated on February 8, 2018. See ECF No. 48 (order). Plaintiff seeks summary judgment on all of its claims related to the 2007 audit and 2010 audit (in Case No. 15-767C), and partial summary judgment on its claims related to the 2012/2013 sales tax audit (in case No. 16-309C). See infra n.5. Defendant seeks summary judgment in its favor on all of plaintiff's claims, and dismissal on jurisdictional grounds of the portion of plaintiff's claim in Case No. 16-309C that was not presented to the contracting officer. The motions are fully briefed and ripe for decision by the court. See ECF No. 74.

### B. Medicare Part D

This lawsuit arises out of the Medicare Part D program, which is a voluntary prescription drug reimbursement program that went into effect on January 1, 2006. See ECF No. 51-1 at 7-8; ECF No. 52 at 10 (citing 42 U.S.C. § 1395w-101 et seq. (2012)). The prescription drug coverage is offered by private providers, known as plan sponsors, who pay the costs for the prescription drugs and are reimbursed by their beneficiaries and the government. See ECF No. 52 at 10.

The Centers for Medicare & Medicaid Services (CMS), a component of the United States Department of Health and Human Services (HHS), "pays plan sponsors a monthly prospective payment throughout each year for each beneficiary enrolled in the plan." Id. (citation omitted). The payments are then reconciled after the end of each year with the plans' "actual level of enrollment, risk factors, levels of incurred allowable drug costs, reinsurance amounts, and low-income subsidies." Id. at 11 (citation omitted). Final reconciled plan years can be reopened and corrected within four years for good cause. See id.

CMS uses electronic records submitted by the plans called prescription drug events (PDEs) to conduct the reconciliations. See id. Plan sponsors submit a PDE recording information about the drug prescribed, its cost, payment details, and other information "[w]henever a Medicare Part D beneficiary fills a prescription." Id. For the years at issue in this dispute, HHS estimated that gross payment errors (both over- and under-payments) in its Medicare Part D payments to plan sponsors ranged from just over one billion dollars at the lowest to over five billion at the highest. See ECF No. 51-1 at 28; ECF No. 53 at 32-33.

### C. The General Services Administration (GSA) Federal Supply Schedule Contract

On June 17, 2010, plaintiff entered into a federal supply schedule contract for financial and business solutions issued by the General Services Administration (GSA),

3

contract number GS-23F-0074W (GSA contract).  See ECF No. 70 at 12.  Pursuant to the contract, plaintiff offered "Financial Management & Audit Services" including "Recovery Audits."  ECF No. 71-1 at 1, 5.  Plaintiff stated in its contract with GSA that it was able and ready to provide services to "accurately quantify, verify, and recover improper payments."  Id. at 5.

The GSA contract contained a "Contract Clause Document" establishing the terms of the contract.  ECF No. 70-1 at 6.  Included in the contract terms was Federal Acquisition Regulation (FAR) clause 52.212-4(l), termination for the government's convenience, which permits the ordering agency to "terminate this contract or any part hereof, for its sole convenience."  Id. at 21.  Under FAR 52.212-4(l), should the agency elect to terminate the contract for convenience, plaintiff would be owed "a percentage of the contract price reflecting the percentage of the work performed prior to the notice of termination, plus reasonable charges the Contractor [could] demonstrate to the satisfaction of the ordering [agency] using its standard record keeping system, [to] have resulted from the termination."  Id.

The GSA contract also included FAR clause 52.246-4, inspection of services—fixed price, which permits the ordering agency to "inspect and test all services called for by the contract, to the extent practicable at all times and places during the term of the contract."  Id. at 81.  Under FAR 52.246-4, should the agency find that the services provided "do not conform with contract requirements, the ordering activity [might] require the Contractor to perform the services again in conformity with contract requirements."  Id.  "If the Contractor fails to promptly perform the services again or to take the necessary action to ensure future performance in conformity with the contract requirements, the ordering activity may: . . . (2) terminate the contract for default."  Id.

    D.    The GSA Contract Recovery Audit Task Order

The passage of the Patient Protection and Affordable Care Act in 2010 required CMS to enter into a contract to obtain "recovery audit" services for Medicare Part D.  See ECF No. 52 at 12 (citing PPACA, Pub. L. No. 111-148, § 6411(b), 124 Stat. 119, 775 (2010) (codified at 42 U.S.C. §1395ddd(h))).  The purpose of such services was to identify and assist in recovering improper payments.  Id.  On December 2, 2010, CMS issued a Request for Quote (RFQ) under the GSA contract to plaintiff for recovery audit contractor (RAC) services.  See id.  "Pursuant to the terms and conditions of Contract No. GS-23F-0074W," CMS awarded plaintiff task order HHSM-500-2011-00006G (task order) on January 13, 2011, to identify improper payments and to recover overpayments made under the Medicare Part D program "on a national scale."  ECF No. 51-3 at 152-54; ECF No. 51-1 at 8.  Only the terms in the task order that were different from the GSA contract were included in the task order; otherwise, "all terms and conditions of the contract remain in effect."  ECF No. 51-3 at 154.

4

The task order, pursuant to which the contractor was paid a firm, fixed-price contingency fee, included a base period and four option years. See ECF No. 53 at 3. Any payments to plaintiff were contingent upon the recovery of improper payments from plan sponsors and were to be fixed as a percentage of such recoveries.[4] See ECF No. 51-3 at 155.

Under the terms of the task order, ACLR was to "perform the work required in accordance with the attached Performance Work Statement (PWS)." Id. at 154; ECF No. 53 at 3. The term of the PWS extended from January 13, 2011, to December 31, 2013. See ECF No. 51-3 at 154; ECF No. 52 at 16. The PWS generally described the audit process, ECF No. 51-3 at 184-93, provided for a review of duplicate payments, id. at 186, and indicated that CMS input and approval would likely be required for the various audit processes, see, e.g., id. at 187, 190. The PWS does not expressly require approval by CMS for data audit activity undertaken by plaintiff; instead the PWS states that "[o]nce the Data Audit has been complete [ACLR] will discuss [its] findings with CMS." Id. at 189. The PWS does require CMS approval for any documentation audits. See id. The terms of the PWS did not reference or modify the terms of the task order or the GSA contract.

The parties later implemented a Statement of Work (SOW), replacing the PWS, that had two phases. The first SOW extended from January 1, 2014, through December 31, 2014 (2014 SOW), and the second SOW extended from January 1, 2015, through December 31, 2015 (2015 SOW). See ECF No. 51-5 at 6, 45. The SOWs explicitly required CMS approval for any audit conducted by plaintiff and set forth a process by which plaintiff was to request that approval. See id. at 14, 17. Neither SOW expressly addressed the cancellation of an audit after CMS had approved it.

Difficulties and delays occurred early in ACLR's contract performance. See ECF No. 51-1 at 10-11. The parties disagree regarding the extent of the difficulties and delays, and whether CMS's actions failed to meet the contract requirements. See ECF No. 53 at 5-7. Plaintiff eventually did begin its work under the contract, and plaintiff does not allege any breach by CMS during the initial period of performance. See ECF No. 51-1 at 33-34, 52. Rather, in two cases, plaintiff alleges three separate breaches by CMS as ACLR attempted to perform pursuant to the contract; the three audits are discussed more fully herein. See id.

---

[4] The contingency fee percentage was raised twice, pursuant to contract modifications, with respect to certain audit activities conducted by plaintiff. See ECF No. 58-6 at 11. There was also a general increase in the contingency fee percentage that was instituted in 2014, for newly approved audit tasks. See ECF No. 53 at 15.

5

1.      Plaintiff's 2007 and 2010 Audit Claims (Case No. 15-767C)

   a.     2007 Audit[5]

Plaintiff began receiving PDE data from CMS in November 2011 and immediately undertook an audit of 2007 PDEs (2007 audit). See ECF No. 53 at 9, 12. The parties do not dispute that, at the time of the 2007 audit, the GSA contract, the task order, and the PWS were in effect. See ECF No. 53 at 3. Pursuant to the task order and the PWS, ACLR was to conduct a "duplicate payments" audit for particular calendar years. ECF No. 51-11 at 6; ECF No. 53 at 10-11. What the parties do dispute is whether plaintiff was required to seek CMS approval prior to conducting an audit. See ECF No. 51-1 at 15; ECF No. 52 at 15.

According to plaintiff, its audit of the 2007 PDE records identified $313,808,241 in improper duplicate payments using a technical method deemed acceptable by CMS. See ECF No. 51-1 at 15; ECF No. 53 at 12. When plaintiff communicated its overall result to CMS, the contracting officer directed plaintiff not to issue any notification letters to the plan sponsors about these findings. See ECF No. 51-1 at 15; ECF No. 53 at 12. Plaintiff asserts that it is due $23,535,618 in contingency fees for the 2007 audit. See ECF No. 51-1 at 49.

   b.     2010 Audit

CMS authorized plaintiff to conduct a duplicate payments audit for calendar year 2010 (2010 audit). See ECF No. 53 at 16-17. Plaintiff conducted the audit in 2014, pursuant to the GSA contract, task order, and the 2014 SOW. See ECF No. 51-1 at 20; ECF No. 52 at 17. In accordance with the procedure set forth in the 2014 SOW, plaintiff sought approval for the audit and the methodology it would use. See ECF No. 51-1 at 20. CMS granted its approval. See id.

According to defendant, its data validation contractor found errors in plaintiff's audited data. See ECF No. 52 at 31-33. Plan sponsors also voiced concerns that a significant portion of the duplicate payments identified by plaintiff were legitimate, rather than duplicative, but would require extensive time and effort to support. Id. Defendant, in turn, requested that plaintiff use a revised audit protocol to review the 2010 data. See id. at 33. Although plaintiff complied with the request, it now argues that defendant had no right, under the contract, to modify the previously approved methodology for plaintiff's audit. See ECF No. 51-1 at 22-23.

---

[5]     In addition to the audits at issue here, the court notes that plaintiff completed seven audits for which it was paid contingency fees under the GSA contract and task order. ECF No. 53 at 47; ECF No. 58-6 at 24-25. The payments for these audits do not appear to have been the subject of any claim submitted by plaintiff to the contracting officer.

After reviewing the evidentiary support documentation from plan sponsors, plaintiff submitted its 2010 audit review package to CMS.  See ECF No. 51-1 at 23. Defendant contends that plaintiff failed to use the revised methodology, and that defendant's data validation contractor once again found errors in plaintiff's audited data. See ECF No. 52 at 34-35.  Defendant requested that plaintiff provide additional information to address the raised concerns; plaintiff declined to do so.  See id. at 35. Plaintiff does not deny that it refused to comply; plaintiff explains that it refused to do so because defendant acted in contravention of the contract terms.  See ECF No. 51-1 at 23.

CMS terminated the 2010 audit, reasoning that it had unaddressed concerns about the validity of the audit results.  See ECF No. 52 at 35.  Having identified $15,909,552 in improper duplicate payments during the 2010 audit, plaintiff seeks, as its contingency fee for that work, $2,209,146.  See ECF No. 51-1 at 23.

2. The 2012/2013 Sales Tax Audit (Case No. 16-309C)

Pursuant to the 2015 SOW, ACLR prepared, in 2015, a new audit issue review package (NAIRP) for the audit of sales tax payments from calendar years 2012 and 2013 (2012/2013 sales tax audit).  See id. at 25.  CMS did not approve the proposed sales tax audit.  See id.  According to plaintiff, CMS's refusal to approve the NAIRP for the sales tax audit was procedurally and factually improper.  See id. at 25-27.  From the sales tax audit, plaintiff identified $626,326,618 in improper sales tax payments, which, plaintiff alleges, should have earned it $75,459,194 in contingency fees.[6]  Id. at 65-66.

II. Legal Standards

According to RCFC 56(a), summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  "[A]ll evidence must be viewed in the light most favorable to the nonmoving party, and all reasonable factual inferences should be drawn in favor of the nonmoving party."  Dairyland Power Coop. v. United States, 16 F.3d 1197, 1202 (Fed. Cir. 1994) (citations omitted).

A genuine dispute of material fact is one that could "affect the outcome" of the litigation.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  "The moving party . . . need not produce evidence showing the absence of a genuine issue of material fact but rather may discharge its burden by showing the court that there is an absence of evidence to support the nonmoving party's case."  Dairyland Power, 16 F.3d at 1202

---

[6] Of note, plaintiff has not sought summary judgment for the portion of its work on the 2012/2013 sales tax audit pertaining specifically to sales tax issues in the state of Louisiana.  See ECF No. 51-1 at 50 n.3, 66 n.9 ("ACLR is not seeking summary judgment on the sales tax NAIRP with respect to the Louisiana sales tax issues.").  Defendant seeks summary judgment as to all of plaintiff's claims in their entirety.

7

(citing Celotex Corp. v. Catrett, 477 U.S. 317, 325 (1986)).  A summary judgment motion is properly granted against a party who fails to make a showing sufficient to establish the existence of an essential element to that party's case and for which that party bears the burden of proof at trial.  Celotex, 477 U.S. at 324.

The Supreme Court of the United States has instructed that "the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact."  Anderson, 477 U.S. at 247-48.  A nonmovant will not defeat a motion for summary judgment "unless there is sufficient evidence favoring the nonmoving party for [the fact-finder] to return a verdict for that party."  Id. at 249 (citation omitted).  "A nonmoving party's failure of proof concerning the existence of an element essential to its case on which the nonmoving party will bear the burden of proof at trial necessarily renders all other facts immaterial and entitles the moving party to summary judgment as a matter of law."  Dairyland Power, 16 F.3d at 1202 (citing Celotex, 477 U.S. at 323).

III.    Analysis

    A.    Defendant Did Not Breach Its Contract with Plaintiff When It Denied or Terminated the Audits

"To recover for breach of contract, a party must allege and establish:  (1) a valid contract between the parties, (2) an obligation or duty arising out of the contract, (3) a breach of that duty, and (4) damages caused by the breach."  San Carlos Irr. & Drainage Dist. v. United States, 877 F.2d 957, 959 (Fed. Cir. 1989) (citations omitted).

The parties agree that they had a valid contract—arising from the GSA contract, the task order, and the PWS or the SOWs—that controlled the parties' relationship.  See ECF No. 53 at 3; ECF No. 69 at 10.  They disagree, however, over the extent of the defendant's ability under that contract to control the work done by plaintiff.  Plaintiff argues that defendant had no right to terminate or deny plaintiff's audits under either the PWS or the SOWs.  See ECF No. 51-1 at 33-35, 53.  Defendant argues that the terms of the GSA contract permitted it to reject plaintiff's work for nonconformance with the contract terms, if necessary, and to terminate—for its sole convenience—any part of the contract.  See ECF No. 70 at 15-17.  The plain language of the GSA contract establishes that defendant was entitled to terminate any portion of the contract for its sole convenience.  Because defendant's actions in denying and terminating the audits were consistent with the terms of the contract, the court finds that, as discussed below, no breach of the contract has occurred.

      1.      Defendant Terminated Plaintiff's Work on the 2007 and 2010 Audits Pursuant to Its Contractual Authority

          a.      The Parties' Contract Permits Termination for Defendant's Convenience

The parties agree that the GSA contract, the task order, and the PWS or the SOWs, controlled the parties' relationship. See ECF No. 53 at 3; ECF No. 69 at 10. But plaintiff argues that "CMS cannot point to any Part D RAC Contract provisions that justify CMS's" terminations of the 2007 and 2010 audits. ECF No. 58 at 10. Defendant counters that the GSA contract's terms allow it to inspect and reject plaintiff's services for nonconformance or, alternatively, to terminate any part of the contract for its sole convenience. See ECF No. 70 at 12-14. In support of its position, defendant points to FAR clauses 52.212-4(l) (termination for convenience) and 52.246-4 (inspection of services) in the GSA contract. See id. Although defendant extensively briefed the issue of its ability to terminate the audits for nonconformance with the contract, the court need not reach this argument; the court agrees that—based on the language of the contract—defendant had the right to terminate any portion of it for defendant's sole convenience.

"Contract interpretation begins with the language of the written agreement." Bell/Heery v. United States, 739 F.3d 1324, 1331 (Fed. Cir. 2014) (quotations omitted). If the contract language is unambiguous, then it must be given its plain and ordinary meaning, such as "would be derived from the contract by a reasonably intelligent person acquainted with the contemporaneous circumstances." TEG-Paradigm Envtl., Inc. v. United States, 465 F.3d 1329, 1338 (Fed. Cir. 2006) (quoting Metric Constrs., Inc. v. Nat'l Aeronautics & Space Admin., 169 F.3d 747, 752 (Fed. Cir. 1999)).

The plain language of FAR clause 52.212-4(l) permits the government to terminate the contract, or any part of it, for its sole convenience:

> Termination for the Ordering Activity's convenience. The ordering activity reserves the right to terminate this contract or any part hereof, for its convenience. In the event of such termination, the Contractor shall immediately stop all work hereunder and shall immediately cause any and all of its suppliers and subcontractors to cease work. Subject to the terms of this contract, the Contractor shall be paid a percentage of the contract price reflecting the percentage of the work performed prior to the notice of termination, plus reasonable charges the Contractor can demonstrate to the satisfaction of the ordering activity using its standard record keeping system, have resulted from the termination. The Contractor shall not be required to comply with the cost accounting standards or contract cost principles for this purpose. This paragraph does not give the ordering activity any right to audit

the Contractor's records. The Contractor shall not be paid for any work performed or costs incurred which reasonably could have been avoided.

ECF No. 70-1 at 21 (GSA contract).

Neither party argues that "a mutually intended and agreed to alternative meaning exists" for this clause. Forman v. United States, 329 F.3d 837, 842 (Fed. Cir. 2003). Plaintiff instead points to the PWS and the SOW as support for its position, but fails to identify any part of the task order, the PWS, or the SOW that modifies the termination for convenience clause of the GSA contract. See ECF No. 73 at 6. The court, therefore, construes the words of the clause, consistent with their ordinary meaning, to permit the government to terminate any part of the contract for its convenience.

Termination for convenience—the right of the government to end a contract when there has been no fault or breach by the non-governmental party—emerged after the Civil War as a means to end war production that was no longer needed. See Torncello v. United States, 681 F.2d 756, 764 (Ct. Cl. 1982) (detailing the history of the termination for convenience clause). Throughout its evolution and eventual incorporation into non-military contracts executed during periods of peace, the clause has retained its fundamental purpose—"to reduce governmental liability for breach of contract, by allocating to the contractor a share of the risk of unexpected change in circumstances." Maxima Corp. v. United States, 847 F.2d 1549, 1552 (Fed. Cir. 1988) (citing Torncello, 681 F.2d at 765-66).

Although a termination for convenience clause gives the government considerable leeway in the cancellation of contracts, the clause is not unbounded. "When the United States, with constitutional authority, makes contracts, it has rights and incurs responsibilities similar to those of individuals who are parties to such instruments." Perry v. United States, 294 U.S. 330, 352 (1935). As such, the termination for convenience clause may only be invoked "'in the event of some kind of change from the circumstances of the bargain or in the expectations of the parties.'" Maxima, 847 F.2d at 1553 (quoting Municipal Leasing Corp. v. United States, 7 Cl. Ct. 43, 47 (1984)). The government may justify a breach as a termination for convenience to minimize damages when the action lawfully falls under that clause, even if the contracting officer calls the action a cancellation or "erroneously thinks that he can terminate the work on some other ground." Id. (quoting G.C. Casebolt Co. v. United States, 421 F.2d 710, 712 (Ct. Cl. 1970)).

Defendant does not argue that the terminations at issue were, at the time, called terminations for convenience by the contracting officer. Defendant does, however, argue that it had the right to, and in fact did, inspect the services offered by plaintiff and then reject them because they failed to conform to the contract. See ECF No. 70 at 15-16. And, defendant continues, if its actions were not justified by the contract, the terminations should be considered constructive terminations for convenience. See id. at

10

17. Plaintiff contends that CMS breached the contract when it terminated the audits. See ECF No. 73 at 6-7. Plaintiff reasons that there is no evidence to support CMS's claim that it inspected the audits and rejected them on the basis that they failed to conform to contractual requirements. See id. at 6. The parties agree as to the material facts concerning the terminations; they disagree as to whether defendant was authorized to effect the terminations, and, if defendant was authorized to do so, they disagree as to whether those terminations can now be deemed constructive terminations for convenience. The court turns next to determine whether defendant's alleged breaches were constructive terminations for convenience.

        b.        Defendant Constructively Terminated Plaintiff's 2007 and 2010 Audits for Convenience Pursuant to the Contract

A constructive termination for convenience is a judicially created concept to retroactively justify a breach by the government when "the basis upon which a contract was actually terminated is legally inadequate to justify the action taken." Maxima, 847 F.2d at 1553. Thus, the court will deem a breach a termination for convenience in circumstances in which the government "has stopped or [has] curtailed a contractor's performance for reasons that turn out to be questionable or invalid." Torncello, 681 F.2d at 759; see also Praecomm, Inc. v. United States, 78 Fed. Cl. 5, 12 (2007) (deeming a "deletion of work" from the contract at issue a termination for convenience).

A constructive termination for convenience, like an actual termination, may only be employed when there has been a change in circumstances or expectations. Maxima, 847 F.2d at 1553. It may not be invoked to justify a breach in a way that leaves the non-governmental party with no consideration for its bargain. See Torncello, 681 F.2d at 769 (holding that a requirements contract, when paired with a termination for convenience clause that permitted the government to give no work, was illusory). It also may not be invoked to create a breach where there has been no breach and the contract was fully performed on both sides. See Maxima, 847 F.2d at 1554-55 (reasoning that the clause is not intended to permit "unilateral renegotiation of a contract after it has been fully performed").

The parties agree that CMS did not allow plaintiff to proceed with the 2007 audit after it had reviewed the data and presented defendant with its findings. See ECF No. 52 at 58. Defendant explains that it requested that plaintiff not proceed with the audit because plaintiff had not identified for defendant the PDE records it audited, plaintiff's findings had not been validated, and defendant had not implemented a framework for collecting the overpayments identified. See id. at 26. As with the 2007 audit, the parties agree that defendant put an end to the 2010 audit after it had approved the audit and methodology and plaintiff had undertaken review of the data. See id. at 30. Defendant explains that, through a fairly extensive back-and-forth process with plaintiff, it determined that there were issues with the validity of the data generated by the audit. See id. at 30-35.

11

Plaintiff argues that defendant failed to produce evidence to support the claim that defendant rejected the audits because they did not conform to contractual requirements. See ECF No. 73 at 6-7.  Plaintiff further argues that defendant cannot avail itself of a "retroactive termination for convenience" because defendant entered into the contract knowingly not intending to honor its obligations.  Id. (citing Torncello, 681 F.2d at 756).  Plaintiff observes that defendant did not develop a recoupment mechanism until the second year of contract performance and thus, "could not have entered into the contract in good faith when ACLR's sole basis for payment relied on a mechanism that did not exist." ECF No. 73 at 7.  Plaintiff claims that the contract contained no language permitting the termination of either the 2007 or 2010 audit, and plaintiff asserts that defendant's procedure for terminating the 2010 audit was flawed.  See id. at 8-9.

The court may find a constructive termination for convenience when the government's reasons for halting contract performance "turn out to be questionable or invalid." Torncello, 681 F.2d at 759.  Here, the court is persuaded that defendant's actions may appropriately be deemed a constructive termination for convenience.  Defendant's expressed concern regarding the validity of the data generated by the audits, and its uncertainty about the workability of the PWS as it pertained to the 2007 audit, constitute changed circumstances that would have supported a termination for convenience by defendant at the time and therefore, may be constructively effected now. See ECF No. 52 at 26-27; see also Maxima, 847 F.2d at 1553; Praecomm, 78 Fed. Cl. at 12 (finding a partial termination for convenience where defendant accepted portions of plaintiff's work).

Plaintiff's contention that the finding of a termination for convenience would render the contract illusory is unavailing.  The contract was not fully performed such that a constructive termination for convenience would effectively permit a unilateral renegotiation.  See Maxima, 847 F.2d at 1554-55.  Moreover, a constructive termination for convenience does not leave plaintiff without consideration for its bargain.  See Torncello, 681 F.2d at 769.  The court finds that defendant's termination of the 2007 and 2010 audits was not a breach of the contract, but rather a constructive termination for convenience.  As such, plaintiff's motion for summary judgment as to these claims is denied, and defendant's motion for summary judgment as to these claims is granted.

        2.        Defendant Denied Plaintiff's Proposed 2012/2013 Sales Tax Audit Pursuant to Its Contractual Authority

              a.        The Portion of Plaintiff's 2012/2013 Sales Tax Audit Claim That Was Not Presented to the Contracting Officer Is Not Properly Before the Court

As an initial matter, the court must address defendant's jurisdictional challenge to the portion of plaintiff's 2012/2013 sales tax audit claim that exceeds the amount of the sales tax audit certified claim that plaintiff presented to the contracting officer.  See ECF

No. 52 at 55-57. Plaintiff responds that its claim represents an enlarged claim and that the court should address it, as an exercise of judicial economy. See ECF No. 58 at 6-7. The court, however, lacks jurisdiction over any portion of plaintiff's claim that was not presented to the contracting officer. See, e.g., Johnson Controls World Serv., Inc. v. United States, 43 Fed. Cl. 589, 592 (1999) ("A valid final decision by the contracting officer is thus 'a jurisdictional prerequisite to further legal action thereon.'") (quoting Sharman Co. v. United States, 2 F.3d 1564, 1568 (Fed. Cir. 1993)). Plaintiff may not "circumvent the statutory role of the contracting officer to receive and pass judgment on the contractor's entire claim." Cerberonics, Inc. v. United States, 13 Cl. Ct. 415, 418 (1987). Here, plaintiff failed to present a portion of its claim to the contracting officer. Therefore the court does not have jurisdiction over that claim unless it represents an appropriate enlarged claim. Id.

To establish that its additional damages represent an enlarged claim over which this court may exercise jurisdiction, plaintiff must demonstrate that the claim arose out of the same set of operative facts as the original claim and that plaintiff neither knew, nor reasonably should have known, of the factors justifying the increased claim when it presented it to the contracting officer. See Kunz Const. Co. v. United States, 12 Cl. Ct. 74, 79 (1987). Plaintiff admitted that the increase in its claim came about when ACLR identified additional "granular and less conspicuous markers" of questionable payments in the 2012/2013 sales tax audit data after it had submitted the claim to the contracting officer. See ECF No. 58 at 6. Plaintiff is, by its own description, experienced in conducting recovery audits, and therefore plaintiff should have known of the factors needed to justify the increase in its claim when it presented the claim to the contracting officer. See ECF No. 51-3 at 42. As such, the court finds that plaintiff's enlarged claim is not permissible. See Kunz, 12 Cl. Ct. at 79 (finding that plaintiff was an experienced contractor and therefore should have known that its additional damages existed and had to be submitted to the contracting officer).

Accordingly, the portion of plaintiff's 2012/2013 sales tax audit claim (submitted under Case No. 16-309C) that was not presented to the contracting officer is dismissed for lack of subject matter jurisdiction. The court addresses herein only the portion of plaintiff's 2012/2013 sales tax audit claim that plaintiff did present to the contracting officer in its certified claim, which the contracting officer denied—that is, plaintiff's certified claim of $79,314,795.

                b.      Defendant Properly Denied Plaintiff's Proposed 2012/2013 Sales Tax Audit

Defendant reports that plaintiff received data from CMS regarding the 2012 calendar year in January 2014, data for the 2013 calendar year in late March 2015, and corrected data for the 2013 calendar year in June 2015. See ECF No. 52 at 38; ECF No. 52-1 at 164-65, 338-42; ECF No. 58-6 at 50. Plaintiff reviewed the data and submitted to defendant a NAIRP, which defendant denied on September 3, 2015, in a short email. See

ECF No. 51-1 at 52; ECF No. 51-9 at 11 (September 3, 2015 denial email). Because plaintiff's analysis of the PDEs, its submission of the NAIRP, and the denial of the NAIRP all occurred in 2015, the parties' contractual relationship was governed by the GSA contract, the task order, and the 2015 SOW. See ECF No. 53 at 21.

Plaintiff argues that the denial of the NAIRP constituted a breach of contract because CMS failed to follow the SOW procedures governing the approval of a NAIRP. See ECF No. 51-1 at 51-53. Defendant responds that CMS's failure to "mechanically follow all of the Appendix E timeline steps, when it already had decided to deny the sales tax NAIRP for legitimate reasons, does not invalidate its decision." ECF No. 52 at 70. The court agrees with defendant. The specific steps outlined in the SOW's "Appendix E" chart detailing the timeline for the approval of a NAIRP provide guidance, but not requirements, for every circumstance. See ECF No. 52 at 70; see also ECF No. 51-5 at 79-80 (setting forth the "New Issues Submission and Approval Process"). The SOW does not require that every NAIRP follow each step in the Appendix E approval process chart. See ECF No. 52 at 62. Instead, it calls for the contractor to "work[] with CMS[] to refine and approve or deny the NAIRP. Once approved the RAC begins audit activities." Id. On review of the SOW procedures, the court finds no contract breach occasioned by the manner in which CMS denied the proposed sales tax audit.[7]

Plaintiff also argues that the denial of the NAIRP itself constituted a contract breach. See ECF No. 51-1 at 54-57. In denying the NAIRP, CMS cites section 1.2.3 of the SOW. ECF No. 51-9 at 11. CMS notes that, pursuant to section 1.2.3, it "consistently ensures RAC efforts are not duplicative," and stated that the "audit issue is currently open and active with another CMS contractor." Id. Plaintiff asserts that because its efforts were not duplicative and because there was no other "open and active" audit for sales tax at the time, defendant breached the contract. ECF No. 51-1 at 54. Defendant responds by offering an extensive explanation of the various sales tax application issues that it was pursuing with another contractor, and insisting that CMS's right to deny a proposed audit issue was absolute and not conditioned on section 1.2.3 of the SOW. See ECF No. 52 at 69-71.

The court again agrees with defendant—the SOW does not condition CMS's ability to deny a NAIRP. Rather, it provides that a submitted NAIRP will either be revised and approved, or denied. See ECF No. 51-5 at 52 ("Once submitted the RAC works with CMS/CPI to refine and approve or deny the NAIRP."). In its denial email, defendant provided an explanation to plaintiff, and provided a fuller explanation in its briefing. See ECF No. 52 at 69-71.

---

[7] In its email denying plaintiff's NAIRP, defendant offered ACLR the opportunity to learn more concerning CMS's denial, but plaintiff elected to file a certified claim regarding the proposed 2012/2013 sales tax audit instead. See ECF No. 51-9 at 11.

14

The terms of the SOW permitted defendant to deny plaintiff's NAIRP. Because defendant's actions were consistent with the terms of the contract, plaintiff's breach of contract claim related to the 2012/2013 sales tax audit cannot stand and must be denied. Defendant's motion for summary judgment must be granted as to this count.

### 3. Defendant Did Not Breach the Implied Covenant of Good Faith and Fair Dealing

As a matter of basic contract law, "[b]reach of the duty of good faith and fair dealing is a theory of breach of the underlying contract, not a separate cause of action." CFS Int'l Capital Corp. v. United States, 118 Fed. Cl. 694, 701 (2014) (citations omitted). "To state a claim for breach of the implied covenant of good faith and fair dealing, a party . . . generally must allege some kind of 'subterfuge[ ]' or 'evasion[ ],' such as 'evasion of the spirit of the bargain, lack of diligence and slacking off, willful rendering of imperfect performance, abuse of a power to specify terms, [or] interference with or failure to cooperate in the other party's performance.'" Dotcom Assocs. I, LLC v. United States, 112 Fed. Cl. 594, 596 (2013) (citing Restatement (Second) of Contracts § 205 (1981)). Importantly, to maintain both a breach of contract and a breach of good faith and fair dealing claim, plaintiff must show that each claim is founded upon different allegations. See CFS Int'l, 118 Fed. Cl. at 701.

Plaintiff argues that its reasonable expectation of pursuing recovery payments and receiving a "sizeable contingency fee payment" was thwarted by defendant's actions in delaying, denying, and ultimately terminating the audits at issue here. See ECF No. 51-1 at 38-40, 60-61. Plaintiff asserts that defendant's insistence that the audits could not proceed under the PWS, and that the audit data must have been validated, interfered with plaintiff's performance and disregarded plaintiff's consideration under the contract. See id. at 42-46, 62-63. Defendant responds that, because its actions were consistent with its contractual rights, it cannot be found to have breached the duty of good faith and fair dealing. See ECF No. 52 at 64-65. Defendant asserts that it did, in fact, act in good faith and with reason when it terminated each of the audits at issue, and that its decision was not "irrational or unreasonable under the circumstances known to the agency at that time." Id. at 73.

Underlying plaintiff's assertions regarding breach of the duty of good faith and fair dealing are the same facts and circumstances that inform plaintiff's breach of contract assertions. Plaintiff alleges that, by acting as it did to deny and terminate the audits, defendant interfered with plaintiff's ability to perform. See ECF No. 51-1 at 38-46, 60-63. This is merely a breach allegation couched in different language. Not all government action that affects a contract violates the duty of good faith and fair dealing. See Precision Pine & Timber, Inc. v. United States, 596 F.3d 817, 829 (Fed. Cir. 2010). Plaintiff's claim that defendant's interference dispensed with its consideration under the contract is not supported by the record and does not rise to the level of an "evasion of the spirit of the bargain." Dotcom Assocs., 112 Fed. Cl. at 596 (internal quotation marks

15

removed); see also Precision Pine, 596 F.3d at 831 (finding that government action that delays performance does not destroy the contemplated benefit or the parties' reasonable expectations under the contract when the contract does not guarantee uninterrupted performance but expressly contemplates modification, suspension, or cancellation). As already discussed, defendant's denial of the 2012/2013 sales tax audit and terminations of the 2007 and 2010 audits fell within defendant's contemplated contractual right to cancel. See supra. Because plaintiff's good faith and fair dealing claim is premised on the same factual allegations as its breach claims, plaintiff's motion for summary judgment must be dismissed, and defendant is entitled to summary judgment on this count as well.

> B. Plaintiff Is Entitled to Compensation for Defendant's Termination for Convenience Pursuant to the GSA Contract

While defendant's actions do not constitute a breach of contract, the termination of the 2007 and 2010 audits effected constructive terminations for convenience. As such, under the terms of the contract, defendant is liable to plaintiff for "a percentage of the contract price reflecting the percentage of the work performed prior to the notice of termination, plus reasonable charges the Contractor can demonstrate to the satisfaction of the ordering activity using its standard record keeping system, [that] resulted from the termination." ECF No. 70-1 at 21 (GSA contract).

Plaintiff's current damages claim is for an amount that would "place ACLR in as good a position as ACLR would have been in if CMS had performed in accordance with the Part D RAC Contract or had complied with its duty of good faith and fair dealing." ECF No. 51-1 at 47, 64. However, "[i]n contrast with damages stemming from a breach of contract, the sum due a contractor after a termination for convenience is significantly circumscribed." Praecomm, 78 Fed. Cl. at 12. Plaintiff presented no evidence or argument as to the amount of damages owed upon a termination for convenience.

Defendant argues that even under a termination for convenience scenario, plaintiff has no damages because "it did not put in any significant work on these audits." ECF No. 70 at 20. Defendant further argues that, although plaintiff made a claim to the contracting officer for "$2,668,553 in operating costs and lost profit," plaintiff "does not know what of [that] amount" is related to plaintiff's work on the audits at issue, and "has not made a claim for it, and cannot recover." Id.

The parties have not presented sufficient evidence and argument regarding the percentage of work performed by plaintiff, or its reasonable charges resulting from a termination for convenience, to enable the court to determine the amount of compensation to which plaintiff is entitled. Plaintiff's damages calculations clearly did not contemplate a termination for convenience, and defendant's bare assertion that plaintiff is not entitled to damages is inadequate. The court will, therefore, require additional submissions from the parties on this issue.

16

IV.    Conclusion

For the foregoing reasons:

(1) Plaintiff's motion for partial summary judgment, ECF No. 51, is **DENIED**; and plaintiff's claim for damages in Case No. 16-309C above that which it presented to the contracting officer is **DISMISSED** for lack of jurisdiction;

(2) Defendant's cross-motion for summary judgment, ECF No. 52, is **GRANTED**;

(3) On or before **April 13, 2020**, the parties shall **CONFER** and **FILE** a **notice** attaching the parties' **proposed redacted version** of this opinion, with any protectable information blacked out; and

(4) On or before **April 20, 2020**, the parties shall **CONFER** and **FILE** a **joint status report** proposing next steps for addressing the remaining issues in this matter.

IT IS SO ORDERED.

                                                s/Patricia E. Campbell-Smith
                                                PATRICIA E. CAMPBELL-SMITH
                                                Judge